**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **HELEN L. BARNES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:06CV106 HEA(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,[1]** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Helen L. Barnes for Disability Insurance Benefits under Title II of the

Social Security Act and Supplemental Security Income under Title XVI of the Act. The cause

was referred to the undersigned United States Magistrate Judge for a Report and

Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of

Plaintiff's Complaint. (Document Number 14). Defendant has filed a Brief in Support of the

Answer. (Doc. No. 15).

**Procedural History**

On November 4, 2005, plaintiff filed her application for benefits, claiming that she became

---

[1]This case was originally filed against Jo Anne B. Barnhart, who was at that time
Commissioner of the Social Security Administration. On February 12, 2007, Michael J. Astrue
became the Commissioner of the SSA, and he hereby is substituted as the defendant in this action.
See Fed.R.Civ.P. 25(d)(1).

unable to work due to her disabling condition on October 16, 2004. (Tr. 88-90). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated April 29, 2006. (Tr. 42-47, 9-16). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on July 12, 2006. (Tr. 5, 2-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on March 31, 2006. (Tr. 19). Plaintiff was present and was represented by counsel. (Id.). The ALJ admitted a number of exhibits into the record. (Id.).

The ALJ then examined plaintiff, who testified that she resides in Ellington, Missouri, and lives alone. (Id.). Plaintiff stated that she had previously been married and that she did not have any minor children. (Id.). Plaintiff testified that she was 47 years of age and was a high school graduate. (Id.).

Plaintiff testified that she works at a nursing home where she does laundry. (Tr. 20). Plaintiff stated that she was working eight hours a day three days a week at the time of the hearing. (Id.). Plaintiff testified that she is on her feet all day, except during breaks. (Id.). Plaintiff stated that she has worked at the nursing home for eighteen years. (Id.). Plaintiff testified that five years prior to the hearing, she was able to do more laundry and perform housekeeping duties. (Id.). Plaintiff stated that she is unable to perform any housekeeping duties

such as mopping and other heavy work. (Id.). Plaintiff testified that she is paid at a rate of $6.75 an hour at the nursing home. (Id.).

Plaintiff testified that she has diabetes. (Id.). Plaintiff stated that she takes a pill twice daily for her diabetes. (Tr. 21). Plaintiff testified that her blood sugar levels range from 115 to 145, depending on her diet and other factors. (Id.). Plaintiff stated that she occasionally experiences numbness in her legs, feet, and hands when she sits for long periods of time. (Id.). Plaintiff testified that her doctor told her that the numbness is caused by her diabetes and arthritis. (Tr. 21). Plaintiff stated that she also experiences gout once or twice every two to three months in her right elbow and left heel. (Tr. 21-22).

Plaintiff testified that she has arthritis in her knees and throughout her body. (Tr. 22). Plaintiff stated that she has problems gripping with her hands, although she is able to cut her meat and dress herself. (Id.). Plaintiff testified that she has difficulty sitting for long periods of time and walking long distances. (Id.). Plaintiff stated that her job requires walking and standing. (Id.). Plaintiff testified that she is able to stand for ten to twenty minutes if she can move around. (Id.). Plaintiff stated that she can lift ten to fifteen pounds. (Tr. 23).

Plaintiff's attorney then questioned plaintiff, who testified that she works eight hours a day three days a week, but she takes between six and seven breaks throughout the workday. (Id.). Plaintiff stated that she requires frequent breaks during the workday due to her back and joint pain. (Id.). Plaintiff testified that she is unable to work a full day without taking breaks. (Id.).

Plaintiff stated that she takes several medications daily, as prescribed by her doctor. (Id.). Plaintiff testified that her medications initially provided relief but their effectiveness has decreased over time. (Id.). Plaintiff stated that she takes a water pill to decrease the swelling in her feet,

hands, and legs.  (Tr. 24).  Plaintiff testified that the swelling increases when she is on her feet for

long periods of time.  (Id.).  Plaintiff stated that her feet are swollen at the end of an eight-hour

workday.  (Id.).

Plaintiff testified that her medications cause side effects, including dizziness, upset

stomach, and frequent urination.  (Tr. 24-25).  Plaintiff stated that the frequent urination is part of

the reason she requires so many breaks during the workday.  (Tr. 25).  Plaintiff testified that her

boss allows her to take frequent breaks because he is aware of her medical problems.  (Id.).

Plaintiff stated that her doctor wrote a letter to her boss stating that she has severe degenerative

disc disease,[2] which is why she no longer has to perform housekeeping duties.  (Id.).

Plaintiff testified that when she is not working, she watches television, reads books, and

listens to music.  (Id.).  Plaintiff stated that she spends most of the time lying on the couch.

(Tr. 26).  Plaintiff testified that lying down helps her back pain.  (Id.).  Plaintiff stated that she

stands the majority of time at work, which increases her back pain.  (Id.).  Plaintiff testified that

she does not believe she could work at a job that allowed her to sit eight hours a day due to her

back pain.  (Id.).  Plaintiff stated that her back hurt from sitting at the hearing.  (Id.).

Plaintiff testified that her son comes to her house and helps her with yard work and other

chores that she is unable to perform.  (Id.).  Plaintiff stated that her son also fixes items at her

house and changes her light bulbs.  (Id.).  Plaintiff testified that she is unable to change her light

bulbs because she is afraid of falling due to her dizziness.  (Tr. 26-27).  Plaintiff stated that her

daughter-in-law also helps with heavy household chores, such as vacuuming.  (Tr. 27).  Plaintiff

---

[2]A general term for both acute and chronic processes destroying the normal structure and
function of the intervertebral discs.  See J. Stanley McQuade, Medical Information Systems for
Lawyers, § 6:27 (1993).

testified that she is unable to vacuum due to her back pain.  (Id.).

Plaintiff testified that she used to enjoy gardening, but she is unable to garden now due to her impairments.  (Id.).  Plaintiff stated that she last gardened four years prior to the hearing. (Id.).  Plaintiff testified that one of the reason she no longer gardens is because she is unable to bend down and crawl.  (Id.).

The ALJ then examined plaintiff, who testified that she has one adult child.  (Tr. 28).

## B.    **Relevant Medical Records**

In a note dated June 26, 2002, R. Gayle, D.O. stated that plaintiff has "severe degenerative disc disease of her back.  She should not be using a buffer."  (Tr. 205).

The record reveals that plaintiff saw Dr. Gayle at the Wayne Medical Center for various complaints from January of 2004 through the date of the hearing.  (Tr. 158-206).  On January 5, 2004, plaintiff complained of back, hip, right elbow and right wrist pain.  (Tr. 196).  Plaintiff also reported problems at work with her nerves.  (Id.).  Upon physical examination, Dr. Gayle found no swelling in plaintiff's hands.  (Tr. 197).  Dr. Gayle's diagnosis was degenerative osteoarthritis[3] of spine, inflammatory joint disease,[4] and depression.  (Id.).  He prescribed ibuprofen, Zoloft,[5] and

---

[3]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's Medical Dictionary, 1282 (27th Ed. 2000).

[4]General term for a chronic inflammatory disease, such as rheumatoid arthritis, that causes the immune system to attack the joints, leading to loss of mobility due to pain and joint destruction.  See Medical Information Systems for Lawyers, § 6:201.

[5]Zoloft is indicated for the treatment of major depressive disorder, obsessive-compulsive disorder, panic disorder, and post-traumatic stress disorder.  See Physicians' Desk Reference (PDR), 2676-77 (57th Ed. 2003).

Dep Medrol.[6]  (Id.).

Plaintiff presented to Dr. Gayle on March 5, 2004, with complaints of back pain and abdominal pain.  (Tr. 194).  Dr. Gayle continued plaintiff on her medications.  (Id.).

On June 9, 2004, Dr. Gayle noted that plaintiff's blood pressure was running high.  (Tr. 192).  Dr. Gayle's diagnosis was hypertension,[7] uncontrolled.  (Id.).

On June 24, 2004, Dr. Gayle noted that plaintiff's blood pressure and blood sugar levels were high.  (Tr. 190).  Dr. Gayle diagnosed plaintiff with hypertension, hyperglycemia,[8] and gout.[9]  (Tr. 191).

On July 26, 2004, plaintiff complained of lower abdominal pain and denied being depressed.  (Tr. 188).  Dr. Gayle stated that plaintiff's blood pressure was normal.  (Id.).  Dr. Gayle diagnosed plaintiff with hypertension and non insulin-dependent diabetes mellitus (NIDDM).[10]  (Tr. 189).

---

[6]Depo Medrol is an injectable anti-inflammatory glucocorticoid indicated for the treatment of many different conditions, including endocrine disorders, rheumatoid disorders, collagen disorders, dermatologic diseases, and allergic states.  See PDR at 2733-34.

[7]High blood pressure.  Stedman's at 855.

[8]An abnormally high concentration of glucose in the circulating blood, seen especially in patients with diabetes mellitus.  Stedman's at 849.

[9]A disorder of purine metabolism, characterized by a raised but variable blood uric acid level and severe recurrent acute arthritis of sudden onset resulting from deposition of crystals of sodium urate in connective tissues and articular cartilage.  Stedman's at 764.

[10]An often mild form of diabetes mellitus of gradual onset, usually in obese individuals over age 35; absolute plasma insulin levels are normal to high, but relatively low in relation to plasma glucose levels; ketoacidosis (a pathologic state characterized by the enhanced production of ketone bodies) is rare, but coma can occur; responds well to dietary regulation and/or oral hypoglycemic agents, but diabetic complications and degenerative changes can develop.  Stedman's at 491.

On August 30, 2004, plaintiff complained of pain in both feet and depression. (Tr. 186). Dr. Gayle noted that plaintiff had a history of gout. (Id.). He diagnosed plaintiff with NIDDM and gout. (Tr. 187).

On December 16, 2004, plaintiff complained of pain in her left shoulder and hands. (Tr. 182). Dr. Gayle noted abdominal pain, joint pain, swelling, and stiffness. (Id.). Dr. Gayle's diagnosis was gout, NIDDM, inflammatory joint disease, and hypertension. (Tr. 183). He recommended that plaintiff continue her diabetic diet and gout diet, continue her medications, and start Naprosyn.[11] (Id.).

Plaintiff presented to Chul Kim, M.D. for an internist examination at the request of the Commissioner on November 29, 2005. (Tr. 171-74). Plaintiff's chief complaints were listed as: diabetes mellitus, hypertension, and back problem. (Tr. 171). Dr. Kim stated that plaintiff had been treated for her diabetes mellitus for the past three years. (Id.). Plaintiff reported that she checks her blood sugar levels only when she can afford the test strips. (Id.). Plaintiff indicated that she had last checked her blood sugar levels two to three months prior to her examination. (Id.). Dr. Kim stated that plaintiff had been treated for hypertension for about eight years. (Id.). Plaintiff reported that she injured her back in 1990 when moving a patient while at work. (Id.). Plaintiff stated that an x-ray revealed that two lower lumbar[12] disc spaces were almost gone.

---

[11]Naprosyn is a non-steroidal anti-inflammatory drug indicated for the treatment of rheumatoid arthritis and osteoarthritis. See PDR at 2891-92.

[12]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

(Id.).  Plaintiff reported a sharp pain in her lower back when she bends over, lifts more than ten pounds, or stands in one spot for more than ten minutes.  (Id.).  She indicated that the pain is across the lower back running to her left thigh and to her knee.  (Id.).  Plaintiff also complained of numbness in the left thigh.  (Id.).  Plaintiff's height was five feet, five inches, and her weight was 259 pounds.  (Tr. 172).  Upon physical examination, plaintiff exhibited some limited range of motion with pain in the lumbar spine and both knees.  (Tr. 173).  Plaintiff's straight leg raising was up to 60 percent bilaterally with lower back pain with right leg raising and pain in the back of the left thigh with left leg raising.  (Id.).  Plaintiff's gait was slow but stable and she was able to bear full weight on the right leg and left leg for a few seconds, walk on her heels and toes, and get on and off the examining table without significant problem.  (Id.).  Plaintiff's squatting was only up to half way with lower back pain, and she had difficulty rising from the lying position due to back pain.  (Id.).  Dr. Kim's impression was: diabetes mellitus type 2, on oral hypoglasmic agents; hypertension that is not well controlled but without significant endorgan damage; chronic lower back pain with probable degenerative lumbar disc disease; and abdominal pain with probable gastritis[13] and/or peptic ulcer disease.[14]  (Tr. 174).

    Plaintiff underwent x-rays of her lumbar spine and right knee on December 12, 2005. (Tr. 170).  The lumbar spine x-ray revealed a mild degree of bone spur formation at multiple

---

[13]Inflammation of the stomach.  Stedman's at 731.

[14]An ulcer of the alimentary mucosa, usually in the stomach, exposed to acid gastric secretion.  Stedman's at 1904.

vertebrae suggesting a degenerative joint disease.[15]  (Id.).  The intervertebral space at L5[16]-S1[17] was somewhat narrow suggesting degenerative disc disease.  (Id.).  The right knee x-ray revealed no significant abnormality in bones or joints at the knee.  (Id.).

On December 22, 2005, plaintiff complained of lower back pain.  (Tr. 150).  Dr. Gayle noted that plaintiff was obese, weighing 258 pounds.  (Tr. 160).  Dr. Gayle's diagnosis was inflammatory joint disease, gout, NIDDM, and hypertension.  (Tr. 161).

Marsha J. Toll, Psy.D. completed a Psychiatric Review Technique in December of 2005. (Tr. 117-130).  Dr. Toll diagnosed plaintiff with depression that did not satisfy diagnostic criteria. (Tr. 120).  Dr. Toll expressed the opinion that plaintiff's depression caused only mild difficulties in plaintiff's ability to maintain concentration, persistence, or pace, but no limitations in any other area.  (Tr. 127).  Dr. Toll stated that plaintiff's functioning is not significantly limited due to her mental impairment and it is considered non-severe.  (Tr. 129).

P. Gerlach, a state agency medical consultant, completed a Physical Residual Functional Capacity Assessment in December of 2005.  (Tr. 131-38).  The medical consultant expressed the opinion that plaintiff could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds, stand or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and push or pull an unlimited amount.  (Tr. 132).  The medical consultant also found that plaintiff could only occasionally climb and balance, and that plaintiff should avoid concentrated exposure to hazards due to her allegation of dizziness.  (Tr. 133, 135).

---

[15]Synonym for osteoarthritis.  Stedman's at 513.

[16]Abbreviation for lumbar vertebrae (L1 to L5).  Stedman's at 956.

[17]Abbreviation for sacral vertebra (S1 to S5).  Stedman's at 1586.

On March 23, 2006, plaintiff complained of neck pain, ear pain, and sinus congestion.

(Tr. 158).  Dr. Gayle noted that plaintiff had a history of degenerative disc disease of the spine.

(Id.).  Dr. Gayle diagnosed plaintiff with hypertension, gout, and degenerative disc disease.

(Tr. 159).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant met the disability insured status requirements of the Social Security Act on October 16, 2004, the date the claimant stated that she became unable to work, and continues to meet them through December 31, 2009.

2.    The claimant has not engaged in substantial gainful activity since October 16, 2004.

3.    The medical evidence establishes that the claimant has degenerative joint disease of the lumbar spine, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.    Although the claimant has some pain, the claimant's allegation of disabling pain is not credible for the reasons enumerated in the decision.

5.    The claimant has the residual functional capacity to perform the physical exertion requirements of work except for frequent lifting in excess of ten pounds and any lifting in excess of twenty pounds.  There are no non-exertional limitations.

6.    The claimant is unable to perform her past relevant work as a laundry worker.

7.    The claimant has the residual functional capacity to perform the full range of light work.

8.    The claimant is 47 years old, which is defined as a younger age individual.

9.    The claimant is a high school graduate.

10.   With an unskilled work history, the claimant does not have any acquired work skills which are transferable to the skilled or semi-skilled work functions of other work.

11.   Based on the exertional capacity for light work, and the claimant's age, education,

and work experience, Section 404.1569 of Regulations No. 4 and Section 416.969 of Regulations No. 16 and Rule 202.20, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 directs a conclusion of "not disabled."

12. The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520 and 416.920).

(Tr. 15-16).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application filed on November 4, 2005, the claimant is not entitled to a Period of Disability, Disability Insurance Benefits, under Sections 216(i), 223, respectively, of the Social Security Act and is not eligible for Supplemental Security Income under Sections 1602 and 1614(a)(3)(A) of the Act.

(Tr. 16).


## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this

special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  <u>See</u> 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  <u>See</u> 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  <u>See</u> 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  <u>See</u> 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  <u>See</u> <u>id.</u>  Next, the Commissioner must determine the severity of the impairment based on those ratings.  <u>See</u> 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  <u>See</u> 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  <u>See</u> <u>id.</u>  If there is a severe impairment but the

impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff raises two claims on appeal of the decision of the Commissioner.  Plaintiff first argues that the ALJ erred in failing to obtain testimony from a vocational expert.  Plaintiff next argues that the ALJ erred in assessing plaintiff's residual functional capacity.  Although plaintiff does not specifically challenge the ALJ's assessment of plaintiff's credibility, the ALJ's credibility determination affects the analysis of both of plaintiff's claims.  As such, the undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's credibility determination.

## 1.    Credibility Determination

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the

medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.  See also Burress, 141 F.3d at 880.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole.  "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work."  Benksin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987).  Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In his opinion, the ALJ specifically cited the relevant Polaski factors.  (Tr. 14).  The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain.  The ALJ found that the medical evidence does not support plaintiff's subjective complaints.  Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility.  See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ noted that, although plaintiff's treating physician Dr. Gayle stated in a 2002 note that plaintiff had "severe degenerative disc disease," there are no x-ray findings to support this level of severity.  (Tr. 13, 205).  Rather, x-rays of plaintiff's lumbar spine taken in December of 2005 revealed only some mild degenerative changes.  (Tr. 13, 170).  There are no findings of sensory or motor deficits.  (Tr. 13).  The ALJ pointed out that Dr. Gayle did not refer plaintiff to an orthopedic specialist for evaluation or treatment.  (Id.).  The ALJ also noted that, although

plaintiff testified that she suffers from arthritis "all over," x-rays of plaintiff's right knee showed no abnormalities. (Tr. 13, 170). Finally, with regard to plaintiff's blood pressure, the ALJ stated that plaintiff has no significant end organ damage. (Tr. 13, 174).

The ALJ pointed out that, despite plaintiff's complaints of disabling pain, she is able to work a strenuous job where she is required to lift 60 to 70 pounds. (Tr. 13, 154). The ALJ stated that plaintiff is able to sustain eight-hour days three days a week performing this strenuous activity. Plaintiff's ability to perform strenuous work on a part-time basis during the time in which she alleges she was disabled is inconsistent with plaintiff's allegation of disability and may demonstrate an ability to perform substantial gainful activity. See 20 C.F.R. § 404.1571, 416.971; Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994). As such, the ALJ properly determined that plaintiff's ability to work at a strenuous job on a part-time basis detracted from her credibility.

The ALJ stated that plaintiff has received minimal conservative treatment despite the alleged severity of her complaints. (Tr. 14). In fact, the record reveals that plaintiff did not seek treatment for her impairments from December of 2004 through December of 2005. This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).

The ALJ also noted that plaintiff's treating physician, Dr. Gayle, never expressed the opinion that plaintiff was unable to work. (Tr. 14). The only restriction Dr. Gayle imposed upon plaintiff was his 2002 note that she should not operate a buffer. (Tr. 205). The presence or absence of functional limitations is an appropriate Polaski factor, and "[t]he lack of physical restrictions militates against a finding of total disability." Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999)(citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)).

The ALJ also discussed the side effects of plaintiff's medications. (Tr. 14). He pointed out that, although plaintiff complained of dizziness at the hearing, she continues to drive and her medication has not been adjusted due to her alleged side effects. (Id.). The presence or absence of side effects is a proper Polaski factor. See Polaski, 739 F.2d at 1322.

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not credible is supported by substantial evidence.

## 2.    **Residual Functional Capacity**

Plaintiff argues that the ALJ erred in assessing her residual functional capacity. Specifically, plaintiff contends that the ALJ did not consider all of plaintiff's medically determinable impairments in assessing her residual functional capacity. Defendant contends that the ALJ's residual functional capacity determination is supported by substantial evidence.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating

physicians and others, and an individual's own description of his limitations.'" Krogmeier v.

Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863

(8th Cir. 2000)).

After summarizing the medical evidence and discussing plaintiff's credibility, the ALJ

concluded as follows:

> [f]rom the evidence of record, the Administrative Law Judge concludes that, while she
> cannot perform full time arduous or strenuous work, she retains the capacity to perform
> the full range of light work. She retains the capacity to perform frequent lifting up to ten
> pounds and occasional lifting of up to twenty pounds. Because of the exertional
> demands, the claimant is unable to return to her past relevant work.

(Tr. 13). Substantial evidence exists in the record to support the ALJ's assessment of residual

functional capacity. As previously discussed, the objective medical evidence reveals that

plaintiff's back condition was treated conservatively and did not prevent plaintiff from performing

strenuous work on a part-time basis.

Plaintiff contends that the ALJ failed to include evidence provided by plaintiff's employer

that plaintiff requires frequent unscheduled breaks and is restricted to light duty. The ALJ,

however, did note that plaintiff takes unscheduled breaks, and concluded that plaintiff was unable

to perform her past relevant work. (Tr. 13). As such, plaintiff's argument lacks merit.

Plaintiff also argues that the ALJ failed to consider plaintiff's non-exertional limitations,

including pain, uncontrolled hypertension, and obesity, when determining her residual functional

capacity. As discussed above with regard to the ALJ's credibility determination, the ALJ found

that plaintiff's allegations of disabling pain to be not credible. The objective medical record does

not support any further limitations due to plaintiff's hypertension or obesity.

The medical evidence discussed above substantially supports the ALJ's residual functional

capacity assessment that plaintiff can perform the full range of light work activity. Notably, plaintiff's treating physician did not impose any limitations on plaintiff other than she should not operate a buffer. (Tr. 205). Plaintiff received very conservative and infrequent treatment for her impairments. Further, plaintiff was able to perform work that was heavier in exertion than light work on a part-time basis. Thus, the ALJ's residual functional capacity assessment is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

**3.      Vocational Expert Testimony**

Plaintiff finally argues that the ALJ erred by using the Medical-Vocational Guidelines instead of obtaining vocational expert testimony because the ALJ failed to properly consider plaintiff's pain, hypertension, and obesity, as non-exertional impairments. Plaintiff contends that the ALJ's use of the Medical-Vocational Guidelines, commonly known as the "Grids," to determine that plaintiff was capable of performing other work, was error. Plaintiff argues that once a non-exertional impairment is shown to exist, vocational expert testimony is required.

As set forth above, once a claimant establishes that he or she is unable to return to past relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy. The Commissioner may rely on the Medical-Vocational Guidelines to show the availability of work in certain limited circumstances. See Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999). "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'Grids,' which are fact-based

generalization[s] about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." Id. (quotation omitted). Use of the guidelines is permissible only if the claimant's characteristics identically match those contained in grids and only if the claimant does not have non-exertional impairments. See Foreman v. Callahan, 122 F.3d 24, 25 (8th Cir. 1997).

As explained by the Eighth Circuit, "[t]he grids [] do not accurately reflect the availability of jobs to people whose impairments are nonexertional, and who therefore cannot perform the full range of work contemplated within each table." Id. at 26. Accordingly, the Eighth Circuit requires "the Commissioner [to] meet his burden of proving that jobs are available for a significantly nonexertionally impaired applicant by adducing the testimony of a vocational expert." Id. "[W]here a claimant suffers from a nonexertional impairment which substantially limits his ability to perform gainful activity, the grid cannot take the place of expert vocational testimony." Id. (alteration in original) (quoting Talbott v. Bowen, 821 F.2d 511, 515 (8th Cir. 1987)). "Thus, if a claimant's ability to perform the full range of work in a particular category is limited by a non-exertional impairment, the ALJ cannot rely exclusively on the grids to determine disability but must consider vocational expert testimony." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

Here, the ALJ's use of the grids was permissible. The ALJ found that despite her back impairment and pain, plaintiff possessed the residual functional capacity to perform the full range of light work. As discussed above, the ALJ's residual functional capacity determination is supported by substantial evidence. The record does not support any greater restrictions due to her hypertension or obesity. Thus, the ALJ's use of the grids to find plaintiff could perform a

significant number of jobs in the national economy is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## <u>RECOMMENDATION</u>

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act be **affirmed**.

The parties are advised that they have eleven (11) days, until XXX, in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this ___14th___ day of August, 2007.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE